**CURTIS BAY TOWING CO. OF VIRGINIA, Inc.**
v.
**MANSFIELD.**
No. 6630.

United States Court of Appeals Fourth Circuit.

Argued Oct. 16, 1953.

Decided Nov. 9, 1953.

Joseph L. Kelly, Jr., Norfolk, Va., (Williams, Cocke & Tunstall, Norfolk, Va., on brief), for appellant.

Henry E. Howell, Jr., and R. Arthur Jett (Jett, Hykes & Howell, on brief, Norfolk, Va.), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

William Mansfield brought a civil action under the Jones Act, 46 U.S.C.A. § 688, against the Curtis Bay Towing Company of Virginia (hereinafter called Curtis) in the United States District Court for the Eastern District of Virginia for damages on account of alleged personal injuries. The jury found a verdict for Mansfield and fixed the damages at $5,000. Curtis has duly appealed to us.

Plaintiff was the master of defendant's harbor tug, the Nonpareil. On the night of January 10–11, 1953, he was injured in a fall from a boarding ladder extending from the upper deck of his tug to the rail of a cargo vessel, the Edwin S. Nettleton, which he was preparing to dock at a Lambert's Point coal pier. By reason of fresh winds blowing toward the side of the pier where the ship was to be berthed, plaintiff was using two of defendant's tugs, the Nonpareil and the Hawk, in order to make sure that he would have sufficient power to prevent the larger vessel from being blown against the pier. When the accident occurred plaintiff had brought his tug alongside the Nettleton as she moved up the Elizabeth River ship channel toward Lambert's Point, his tug had been made fast to the port side of the Nettleton by a line from the bow of the Nonpareil, so as to be towed forward by the larger ship while his tug lay alongside, and plaintiff had gone upon the boarding ladder for the purpose of transferring to the bridge of the Nettleton. The assisting tug, Hawk, was close by, in the process of getting her own line aboard the Nettleton. While plaintiff was on the ladder, pressure of the Hawk against the port bow of the Nonpareil moved the Nonpareil's bow toward the Nettleton, so that the upper end of the ladder moved along the rail of the Nettleton until it was caught by some obstruction, from which it then sprang free with sufficient force to dislodge the plaintiff, who fell back to the deck of his tug.

Plaintiff asserted liability of Curtis on two grounds: first that the ladder was unseaworthy, and second that the Hawk's crew was negligent in not keeping clear of the Nonpareil while he was on the ladder. The question of the seaworthiness of the ladder is not involved in this appeal, as there was no objection to the manner in which this issue was tried and submitted.

Two questions are presented to us on this appeal: (1) Did the trial court err in submitting to the jury the question of whether plaintiff's fall contributed to the aggravation of plaintiff's prior physical infirmity, angina pectoris? and (2) Did the trial court err in charging the jury that, even if it believed the plaintiff was guilty of negligence, it might, nevertheless, hold the defendant solely responsible for plaintiff's injuries, without any dimunition of damages, on the

theory that the crew of the Hawk had the "last clear chance" to avoid the accident?

Counsel for Curtis have thus phrased this first question: "Did the trial court err in submitting to the jury the question whether plaintiff's fall caused or contributed to the coronary occlusion?" It is significant that the terms "coronary thrombosis" and "coronary occlusion" were injected solely by Curtis.

The claim of Mansfield was only that his angina pectoris was aggravated by his fall from the ladder. No claim was made for damages resulting from a "coronary thrombosis" or "coronary occlusion."

■ The trial court, in its instruction to the jury on the question of the quantum of damages, did not use any of the terms "angina pectoris," "coronary thrombosis" or "coronary occlusion." The court stated:

"If you find for the plaintiff, then the jury in estimating the damages, should take into consideration the bodily injury and disability sustained by the plaintiff, *if any, including any aggravation of any prior physical infirmity* and the permanent or temporary character thereof, the physical pain and mental suffering, if any, of the plaintiff caused thereby, and any loss sustained by him by reason of inability to attend to his ordinary business and affairs by reason of the accident and fix the amount of the damages at such sum as will be just, reasonable and proper compensation therefor. If you believe that the plaintiff will in the future suffer from any injuries that he sustained in this accident, then the jury should also in estimating his damages consider the pain and suffering, if any, to be expected in the future, and the loss, if any, which he may sustain in the future by reason of his inability to attend to his ordinary business and affairs by reason of his injuries.

"The burden is upon the plaintiff in respect to damages to say to the jury by a preponderance of the evidence that each of the items of damage claimed by him may with reasonable certainty be considered by the jury as a natural and probable consequence of the acts of the defendant and the jury can not allow as damages any item of the claim not so proved." (Italics ours.)

Since we think there was sufficient evidence to submit the question of the aggravation of any prior physical infirmity to the jury, this instruction was entirely proper.

Dr. Leigh, the physician of Curtis, testified that worry after a fall, and exertion after a fall, would aggravate angina. Dr. Brooks stated the restriction of motion incident to Mansfield's fall would put "an undue amount of motion on other muscles of the body which would react against the heart." There was nothing in the testimony of the other doctors who gave evidence to contradict these statements of Doctors Leigh and Brooks. Apart from angina, there was medical testimony that the fall of Mansfield tended to aggravate preexisting arthritis and bursitis.

■ We think there was sufficient evidence to justify the submission to the jury of the last clear chance doctrine. Captain Debnam, a dispatcher with many years docking experience, stated unequivocally that it was proper docking practice for the plaintiff to board the Nettleton as soon as his tug was made fast to that vessel. Captain Diggs of the tug Hawk testified that the Mate of the Nonpareil "was putting the ladder up when I got there," when the Nonpareil was made fast to the Nettleton. He further testified:

"Q. Now, did you watch Captain Mansfield, after that ladder was lowered, start up the ladder? A. No, sir.

"Q. You didn't pay any more attention to him until he fell? A.

Until I seen him just before he fell. He turned around and hollered; that is when I first noticed him.

"Q. He was about half way up at that time? A. I would say half way, yes, sir.

\* \* \* \* \* \*

"Q. But you made contact with the tug and then moments later the ladder became fouled? A. That is right.

"Q. And at that time Captain Mansfield was on the ladder? A. Yes, sir, he was on the ladder when I was getting my line up."

The testimony of Captain Diggs as to taking the throttle off might also be noted. Mate Brogan of the Hawk testified:

"Q. As you approached the tug Nonpareil and before you got there, did you see anyone on it boarding the ladder? A. Before we got to the Nonpareil?

"Q. Yes, sir. A. Yes. He was on the ladder and I would say we were ten or fifteen feet away from the Nonpareil.

"Q. Was that person Captain Mansfield? A. Yes, sir."

Further justification for the last clear chance instruction is found in the evidence of Captain Knowlton and that of the plaintiff.

The judgment of the District Court is affirmed.

Affirmed.